1 | McCormick, Barstow, Sheppard,
  | Wayte & Carruth LLP
2 | Gordon M. Park
  | Nevada Bar No. 7124
3 |   *gordon.park@mccormickbarstow.com*
  | Philip A. John
4 | Nevada Bar No. 10627
  |   *philip.john@mccormickbarstow.com*
5 | 8337 West Sunset Road, Suite 350
  | Las Vegas, Nevada 89113
6 | Telephone:   (702) 949-1100
  | Facsimile:   (702) 949-1101
7 |
  | Attorneys for Plaintiff/Counterdefendant Allstate
8 | Property and Casualty Insurance Company,
  | Third-Party Defendants, Walid Khuraibet and
9 | Legacy Agency, LLC, a Nevada corporation



FILED ✓ / ENTERED ___   RECEIVED ___ / SERVED ON ___
COUNSEL/PARTIES OF RECORD

JAN 2 4 2014

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY: _____ DEPUTY

10 | UNITED STATES DISTRICT COURT

11 | DISTRICT OF NEVADA, SOUTHERN DIVISION

| | |
|---|---|
| 12  Allstate Property Casualty Insurance Company, an Illinois corporation, | Case No.  2:12-CV-01288-RCJ-PAL |
| 13 | **MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO CAUSES OF ACTION 1 (BAD FAITH), 3 (BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING), 4 (UNJUST ENRICHMENT), AND 8 (UNFAIR CLAIMS PRACTICES)** |
| 14            Plaintiff, | |
| 15       v. | |
| 16  Kiarash Mirkia, an individual, Poupak Ziaei, an individual, | |
| 17            Defendants. | |
| 18  Kiarash Mirkia, an individual, Poupak Ziaei, an individual, | |
| 19 | |
| 20            Counterclaimants, | |
|        v. | |
| 21  Allstate Property Casualty Insurance Company, an Illinois corporation, | |
| 22 | |
|            Counterdefendant. | |
| 23  Kiarash Mirkia, an individual, Poupak Ziaei, an individual, | |
| 24 | |
| 25            Third-Party Plaintiffs, | |
|        v. | |
| 26  Walid Khuraibet, an individual, Legacy Agency, LLC, a Nevada corporation, | |
| 27 | |
|            Third-Party Defendants. | |
| 28 | |

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
8337 W. SUNSET RD, SUITE 350
LAS VEGAS, NV 89113

03246-01555 2795056.1                                                                          2:12-CV-01288-RCJ-PAL

Motion for Partial Summary Judgment as to Causes of Action 1 (Bad Faith), 3 (Breach of Implied Covenant of Good Faith and Fair Dealing), 4 (Unjust Enrichment), and 8 (Unfair Claims Practices)

1    COMES NOW Plaintiff/Counter-defendant ALLSTATE PROPERTY AND CASUALTY

2    INSURANCE COMPANY ("Allstate") and Third-Party Defendants WALID KHURAIBET and

3    LEGACY AGENCY LLC, by and through their counsel of record, GORDON M. PARK and PHILIP

4    A. JOHN of the Law Offices of McCormick, Barstow, Sheppard, Wayte & Carruth LLP and hereby

5    submits the following Motion for Summary Judgment as to Causes of Action 1 (Bad Faith), 3 (Breach

6    of Implied Covenant of Good Faith and Fair Dealing), 4 (Unjust Enrichment), and 8 (Unfair Claims

7    Practices) based upon FRCP 56.

8                                      **I.**
                             **INTRODUCTION**
9

10   Well-established Nevada law completely bars an action for bad faith against an insurance

11   company for denial of an insured's claim if the insurer had a "reasonable basis" for the denial.

12   Defendants/Counterclaimants' KIARASH MIRKIA and POUPAK ZIAEI (collectively,

13   "Defendants") have brought a counterclaim for bad faith against Allstate, despite the fact that Allstate

14   was clearly entitled to deny coverage to Defendants. This Motion for Partial Summary Judgment will

15   spell out in detail the reasonable bases that Allstate had for denying Dr. Mrikia's claim based upon his

16   repeated material misrepresentations to Allstate. Accordingly, Allstate respectfully requests that this

17   Court issue summary judgment as to Defendants' Causes of Action identified as One (Bad Faith),

18   Three (Breach of Implied Covenant of Good Faith and Fair Dealing), Four (Unjust Enrichment), and

19   Eight (Unfair Claims Practices).

20                                     **II.**
                           **FACTUAL BACKGROUND**
21

22   The following is the uncontested chronological factual background in this matter, except where

23   factual disputes are otherwise noted.  (Please see Exhibit "A", Affidavit of Philip A. John in Support

24   of this Motion for Summary Judgment).

25   **A.**   **Dr. Mirkia Enters Into the Lease Agreement**

26   On December 8, 2011, Dr. Kiaresh Mirkia (hereinafter "Dr. Mirkia") and his wife, Dr. Poupak

27   Ziaei, short-sold their home at 1556 Foothill Village Drive, Henderson, NV, 89012. Their mortgage

28   at the time was $6,830 per month. The purported reason for this short-sale, as given in their Hardship

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
8337 W. SUNSET RD, SUITE 350
LAS VEGAS, NV 89113

03246-01555 2795056.1                              2                        2:12-CV-01288-RCJ-PAL
Motion for Partial Summary Judgment as to Causes of Action 1 (Bad Faith), 3 (Breach of Implied Covenant of Good
Faith and Fair Dealing), 4 (Unjust Enrichment), and 8 (Unfair Claims Practices)

1  Letter to Bank of America, was that they could no longer afford their $6,830 per month mortgage due

2  to a decrease in income and financial distress . (Please See Exhibit "B", Hardship Letter to Bank of

3  America and Financial Information Form).

4        Dr. Mirkia[1] was told by his real estate agent and friend, Joseph Yakubik, that he would not be

5  able to secure financing for a new home and thus he would have to rent for a period of time.  Thus,

6  they sought a home he could rent. (Please see Exhibit "C", Deposition of Joseph Yakubik, Page 25,

7  Lines 6-18).

8        On December 5, 2011, Dr. Mirkia signed the RESIDENTIAL LEASE AGREEMENT for the

9  subject property at 68 Wildwing Court, Las Vegas, Nevada 89135 for a rental rate of $11,263 per

10  month, nearly double the rate of the mortgage he purportedly could not afford. (Please see Exhibit

11  "D", Residential Lease Agreement).  The lease agreement explicitly states that the tenant is required to

12  purchase **renter's insurance**.  Additionally, Ms. Curtis will testify the she understood that Dr. Mirkia

13  was supposed to obtain renters insurance.

14        The lease also indicated that the current owner of the property, Ronell Curtis, was going to be

15  filing for Chapter 11 bankruptcy protection.  Indeed, the lease explicitly called for Dr. Mirkia to make

16  his payments to a law firm, Callister & Reynolds, and that the law firm would then make payments to

17  Bank of America.  It should be noted that bankruptcy was filed within days of the lease being signed

18  and to-date the Chapter 11 bankruptcy has not been approved.[2]  All payments that Dr. Mirkia made

19  were to be used by the landlord to pay towards the loan with Bank of America on which Ronell Curtis

20  had defaulted.

21        In short, this means that Dr. Mirkia was paying rent to Bank of America through a law firm at

22  a rate of nearly twice the mortgage to Bank of America he had indicated he could not afford.

23  However, because it was done through Ronell Curtis's bankruptcy and a separate law firm, apparently

24  Bank of America did not catch wind of this elaborate financial scheme.

25  [1] Please note that although both Dr. Mirkia and Dr. Ziaei are parties in this matter, by both of their sworn deposition
26  testimonies all dealings involving the house, insurance procurement, and the claim were handled by Dr. Mirkia and thus
    this motion will refer specifically to him.

27  [2] Such contracts are all voidable and unenforceable if made by the bankrupt debtor within 6 months of filing for BK
28  protection and thus, the so-called "lease option to buy" which Dr. Mirkia assumed he had in place, was in fact not a
    binding contract at all.

Motion for Partial Summary Judgment as to Causes of Action 1 (Bad Faith), 3 (Breach of Implied Covenant of Good Faith and Fair Dealing), 4 (Unjust Enrichment), and 8 (Unfair Claims Practices)

**B.    Dr. Mirkia Procures the Allstate Homeowner's Policy**

Sometime in early to mid- December 2011, Dr. Mirkia called Walid Khuraibet, an agent for ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY (hereinafter "Allstate") to procure coverage for the Wildwing property. Walid Khuraibet issued the homeowner's policy with an effective date of December 15, 2011. Dr. Mirkia signed the application on January 6, 2012. In addition to buying homeowner's coverage, he scheduled personal property coverage for a necklace valued at $29,800; a tennis bracelet valued at $59,000; earrings valued at $12,000 with the limit for these items being $100,800 and Jewelry-Gem Print scheduled limit of $46,900. On January 7, 2012, the policy was amended to increase the amount of jewelry scheduled to $142,200 for jewelry and $46,900 for the jewelry gem print as Dr. Mirkia also wanted expensive Rolex watches covered under his homeowners policy. Thus, the total amount of jewelry coverage at issue under this homeowner's policy is $189,100. (Please see Exhibit "E", Amended Homeowners Policy, including Declarations Page and Scheduled Personal Property Declarations Page).

**1.    Walid Khuraibet's Version**

Walid Khuraibet will testify that Dr. Mirkia expressly indicated he was purchasing the home. He will further testify that Dr. Mirkia never mentioned he was renting or leasing the home and did not provide Mr. Khuraibet with a copy of the lease until after the claim was initiated in March 2012. Additionally, Walid Khuraibet will testify that he specifically asked Dr. Mirkia if he would like any mortgagee information included on the homeowner's policy and Dr. Mirkia affirmatively represented that he had purchased the home with private financing, and thus there was no mortgagee. (Please see Exhibit "F", Affidavit of Walid Khuraibet).

**2.    Dr. Mirkia's Versions**

Conversely, Dr. Mirkia is expected to testify that he told Walid Khuraibet he was leasing or renting the property. He is also expected to testify that he provided the lease to Walid Khuraibet at some point prior to the claim being instituted. However, the timing and transmission of this alleged transfer has changed significantly throughout this case and is a crucial issue of credibility that will come before the jury. At one point, Dr. Mirkia indicated that he provided the lease to Joseph Yakubik who then provided it to Walid Khuraibet, however, Joseph Yakubik specifically disavowed this at his

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
8337 W. SUNSET RD, SUITE 350
LAS VEGAS, NV 89113

03246-01555 2795056.1          4          2:12-CV-01288-RCJ-PAL
Motion for Partial Summary Judgment as to Causes of Action 1 (Bad Faith), 3 (Breach of Implied Covenant of Good
Faith and Fair Dealing), 4 (Unjust Enrichment), and 8 (Unfair Claims Practices)

1    deposition. Dr. Mirkia specifically testified that he gave Joe Yakubik a copy of the lease who then

2    gave a copy to Mr. Khuraibet. (Please see Deposition of Dr. Mirkia, attached as Exhibit "G" at p. 172,

3    lines 8-10; p. 173, lines 13-17.). Joseph Yakubik has never met Walid Khuraibet. He does not know

4    where his office is. (Please see Exhibit "C", Deposition Transcript of Joseph Yakubik, Page 49, Lines

5    4-11). Joseph Yakubik has never spoken to anyone at Allstate regarding the 68 Wildwing claim.

6    (Please see Exhibit "C", Deposition Transcript of Joseph Yakubik, Page 50, Lines 17-19).

7         At another point, Dr. Mirkia believed that the lease was faxed to Walid Khuraibet, however

8    that fax has never been found and plainly does not exist. Dr. Mirkia then testified that he himself sent

9    a copy of the lease to Mr. Khuraibet by fax, in addition to Mr. Yakubik providing him with a copy.

10    (Exhibit "G", Deposition of Dr. Mirkia at p. 175, lines 11-25). Again, because this is a Motion for

11    Summary Judgment, the standard is such that all facts are construed in Dr. Mirkia's favor. That said,

12    it is critically important for the Court to understand in the context of bad faith, that Allstate was

13    dealing with multiple different versions from Dr. Mirkia about this alleged lease transfer, while Walid

14    Khuraibet has been steadfast and straightforward from day one that he had absolutely no idea that Dr.

15    Mirkia did not own the home until after the claim was investigated and it was brought to his attention.

16        **3.**    <u>**The Application Itself**</u>

17         The Application for Homeowner's Insurance Application No. 100191134897143 was signed

18    by Dr. Mirkia on January 6, 2012. (Please see Exhibit "H", Application for Homeowners Insurance).

19    The Application explicitly stated it was for a Homeowners Policy. (Exhibit "H", Page 1 of 7). The

20    Application also explicitly stated: "Applicant lives in the building as: OWNER" (Exhibit "H", Page 5

21    of 7). The Application also indicated that various discounts were being applied to the policy,

22    including the "home buyer" discount. Finally, the Application stated on page 6, as part of the "binder

23    provision", the following verification is stated above the statement "I have read this entire application,

24    including the binder provision, before signing", and then the insured signed the application:

25               "To the best of my knowledge the statements made on this

26               application, including any attachments, are true. I request the
Company, in reliance on these statements, to issue the insurance

27               applied for. The Company may recompute the premium shown if the
statements made herein are not true. In the event of any material

28               misrepresentation or concealment made by me or with my knowledge
in connection with this application, the Company may deem this

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
8337 W. SUNSET RD, SUITE 350
LAS VEGAS, NV 89113

03246-01555 2795056.1           5           2:12-CV-01288-RCJ-PAL
Motion for Partial Summary Judgment as to Causes of Action 1 (Bad Faith), 3 (Breach of Implied Covenant of Good
Faith and Fair Dealing), 4 (Unjust Enrichment), and 8 (Unfair Claims Practices)

1                 binder and any policy issued pursuant to this application, void.  This

2                 means that the Company will not be liable for any claims or damages
                    which would otherwise be covered."

3       Thus, Mirkia reviewed and confirmed the truth of the facts in the application, and in particular,

4 confirmed that he "owned" the home when in fact he was only a renter.

5 **C.**    **Pre-Loss Inspection**

6       On January 20, 2012, an inspection report was completed based on a January 10, 2012

7 inspection made at the property, by Mueller Reports employee Timothy Clark, Field Rep 1645.

8 (Please see Exhibit "I", Mueller Report).  At that time, the field representative sought to verify the

9 particulars of the home for purposes of confirming that the underwriting of the policy was appropriate.

10 The field representative interviewed Dr. Mirkia.  At that time, Dr. Mirkia again represented himself to

11 be the "owner" of the property, as opposed to "tenant".  (Please see Exhibit "I", CLAIMS-000501).

12 Dr. Mirkia also denied that the property was "rented out" at any time.  (Please see Exhibit "I",

13 CLAIMS-000505).  Dr. Mirkia represented that he may employ a live in housekeeper, but made no

14 mention of any "nannies" or *au pairs*, including Ms. Rodriguez in this matter.  Dr. Mirkia represented

15 that he "purchased" the home in 2011 for approximately $2,600,000 with an estimated market value of

16 $3,200,000.  (Exhibit "I", CLAIMS-000507).

17       In short, Dr. Mirkia represented to the independent inspector that he owned the home, that the

18 home was not rented out, and that he had purchased the home.  Thus, as of January 21, 2012,

19 Allstate's only information regarding ownership status is from its agent, Walid Khuraibet, that Dr.

20 Mirkia owns the home, and from an independent inspector, Timothy Clark, that Dr. Mirkia owns the

21 home.

22 **D.**    **Valuation Issue and New Policy**

23       After Allstate became aware of the value of the home, Allstate notified Walid Khuraibet that it

24 could not insure the property as the value exceeded $2,000,000.  Allstate policy prohibits them from

25 writing homeowners insurance policies in excess of $2,000,000.  This does not appear to be in dispute.

26 Thus, on January 25, 2012, Allstate sent a letter to Dr. Mirkia notifying him that the policy would

27 have to be cancelled as it exceeded their available coverage.  The letter provided a cancellation date of

28 February 15, 2012.  (Please see Exhibit "J", Notice of Cancellation Letter).

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
8337 W. SUNSET RD, SUITE 350
LAS VEGAS, NV 89113

03246-01555 2795056.1            6            2:12-CV-01288-RCJ-PAL
Motion for Partial Summary Judgment as to Causes of Action 1 (Bad Faith), 3 (Breach of Implied Covenant of Good
Faith and Fair Dealing), 4 (Unjust Enrichment), and 8 (Unfair Claims Practices)

1    As soon as Walid Khuraibet learned of the policy cancellation, he sought to secure Dr. Mirkia

2    a new homeowners policy through CHUBB GROUP OF INSURANCE COMPANIES (hereinafter

3    "Chubb"). Just as Dr. Mirkia did with Allstate, a new homeowner's application was filled out and a

4    new homeowners policy was written, this time with Chubb, a completely separate company. Thus,

5    once again, Dr. Mirkia represented to someone, this time a different insurance company, that he

6    owned the home. Of critical importance, just as Allstate did, as soon a Chubb learned that Dr. Mirkia

7    did not in fact own the home, they immediately cancelled the policy with Dr. Mirkia. (Please see

8    Exhibit "K", Chubb Cancellation Request).

9    **E.    The Alleged Loss**

10    Dr. Mirkia and his wife alleged that their live-in nanny *au pair*, Denise Rodriguez-Montoya,

11    stole the jewelry from their home on or about January 30, 2012. As this is a Motion for Summary

12    Judgment, the facts and circumstances of the theft are not in dispute. However, it is important to note

13    the following undisputed facts to better understand the claim:

14    ❖ This alleged loss occurred just 23 days after the last piece of expensive jewelry was scheduled;

15    ❖ This alleged loss occurred just 5 days after Allstate notified Dr. Mirkia it cancelled his policy;

16    ❖ This alleged loss occurred on the same day in which the alleged thief called the police indicating

17    she was being held against her will by Dr. Mirkia and asked the police to search her bags;

18    ❖ This alleged loss is not the first time that Dr. Mirkia or his wife have alleged that either their

19    nannies or house-keepers have stolen from them;

20    ❖ This alleged loss occurred when over $180,000 worth of jewelry was left in an unlocked drawer

21    where an unsupervised nanny had full access;

22    ❖ Lastly, the Detective assigned to this loss had suspicions that the loss never actually occurred and

23    suspended his investigation. (Please see Exhibit "L", Deposition of Detective Melvin Weaver,

24    Pages 28, 29, and 40).

25    Despite the highly suspicious nature and timing of the alleged theft, Allstate opened up a claim

26    when it was notified of the alleged theft by Dr. Mirkia on March 1, 2012.

27

28

McCORMICK, BARSTOW, SHEPPARD, WAYTE & CARRUTH LLP
8337 W. SUNSET RD. SUITE 350
LAS VEGAS, NV 89113

03246-01555 2795056.1                     7                     2:12-CV-01288-RCJ-PAL

Motion for Partial Summary Judgment as to Causes of Action 1 (Bad Faith), 3 (Breach of Implied Covenant of Good Faith and Fair Dealing), 4 (Unjust Enrichment), and 8 (Unfair Claims Practices)

**F.**   **Claim Handling**

Due to the suspicious nature and timing of the alleged theft, Allstate SIU adjuster, Michelle Bolton, was assigned to investigate the claim in addition to the underlying claim handler. Expert Paul Burkett explained in detail in his July 11, 2013 Report that SIU became involved in this claim because it was a (1) mysterious loss just after coverage limits were increased, (2) the loss occurred within 90 days of the policy inception, and (3) the loss was reported more than ten (10) days after the theft. (Please see Exhibit "M", Expert Report of Paul Burkett, Page 14 of 18). Indeed, Dr. Mirkia's own expert Elliott S. Flood agreed that this is exactly the type of case in which SIU involvement would be anticipated because of the multiple red flags. (Elliot Flood's deposition was just completed and will be supplemented to this Court once the transcript is made available).

On March 6, the police report was ordered and on March 9, Ms. Bolton contacted Mr. Khuraibet to obtain follow-up information about Dr. Mirkia and the reason he went to Chubb. (Id.) A recorded statement was taken March 12 and Allstate investigators obtained copies of appraisals/receipts, information from Cultural Care, and had discussions with police. (Id. at 15).

Then on March 13, Ms. Bolton finds out that Dr. Mirkia does not own the subject property. She follows up with Mr. Khuraibet to obtain a copy of the lease. Mr. Khuraibet subsequently contacted Dr. Mirkia to obtain a copy of the lease, who provided Mr. Khuraibet a copy of the lease in March of 2012. Mr. Khuraibet then gave a copy of the lease to Ms. Bolton, confirming that Dr. Mirkia does not own the home. (Id. at 15).

**G.**   **The Policy Would Never Have Been Written if the True Facts Were Known**

Allstate underwriting has established that the policy would not have been issued at all had Dr. Mirkia responded truthfully in the application. Specifically, the Risk Management Policy for Scheduled Personal Property (SPPE) & J Coverage in Nevada dictates specific limits available. Total SPPE and J Coverage cannot exceed 50% of Contents Coverage (C Coverage). Moreover, J Coverage cannot exceed 25% of Contents Coverage (C Coverage). Any single item of SPPE greater than $5,000 cannot exceed 10% of Contents Coverage (C Coverage). Any item over the per item limit must be added to SPPE. The maximum amount of coverage on a Renter's policy is $150,000 for all contents, which would accordingly limit the SPPE to $75,000 with a $15,000 per-item limit. The

MCCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
8337 W. SUNSET RD. SUITE 350
LAS VEGAS, NV 89113

03246-01555 2795056.1                                      8                        2:12-CV-01288-RCJ-PAL

Motion for Partial Summary Judgment as to Causes of Action 1 (Bad Faith), 3 (Breach of Implied Covenant of Good Faith and Fair Dealing), 4 (Unjust Enrichment), and 8 (Unfair Claims Practices)

1  policy, as written, scheduled 4 items specifically, 3 of which were well in excess of the $15,000 per

2  item limit ($29,800, $59,000, and $46,900.) Underwriting confirmed how this policy would never had

3  been written had Allstate known that Dr. Mirkia was renting the house. (Id. at 16)

4       John C. Arnett explained in detail the underwriting issues and why this policy would never

5  have been written by Allstate had it known Dr. Mirkia was renting the home.  Allstate's standard

6  practices treat an application for renter's insurance completely differently than applications for

7  homeowner's insurance.

8       **Question:**   Does the nature of the rental property come into factor in the
                        underwriting/risk assessment analysis at all? For instance, if you're in
9                       the process of buying or you intend to buy or you have an option to
                        buy but currently you're technically a renter, does that impact the
10                      underwriting process at all?

11      **Mr. Arnett:**   The best way for me to describe is you either rent the property and you
                          get a renters' policy, or you own the home and you get a homeowners'
12                        policy. That goes into who truly has insurable interest in the policy
                          itself.

13                        . . .

14
                          so for a renter . . . there is someone out there that owns that property.
15                        They have insurable interest in the dwelling itself. So we don't afford
                          dwelling coverage to the renter. The owner of the home would buy
16                        what we call a landlord's package policy, which include -- is coverage
                          for the dwelling. Then your renter inside the home would have their
17                        option to get renters' coverage.

18      **Question:**   For the contents?

19      **Mr. Arnett:**   Yes.

20  (Please see Exhibit "N", Deposition of John C. Arnett, 92:1-93:1.)  With a renter's policy, Allstate

21  calculates "a value for the contents only, so [Allstate] allow[s] for a certain percentage of [the value of

22  the contents]", while with a homeowner's policy, there is "the specific contents coverage, which is a

23  percentage of your amount of insurance for the overall dwelling and [Allstate] allow[s] a portion of

24  that." (Please see Exhibit "N", Deposition of John C. Arnett, 64:16-21).

25       Mr. Arnett was able to explain Allstate's limits above in the following manner at his

26  deposition:

27       **Mr. Arnett:** The best way for me to describe is you either rent the property and you
                         get a renters' policy, or you own the home and you get a homeowners'
28                       policy." (Please see Exhibit "N", 92:10-12)

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
8337 W. SUNSET RD. SUITE 360
LAS VEGAS, NV 89113

03246-01555 2795056.1                                    9                          2:12-CV-01288-RCJ-PAL
Motion for Partial Summary Judgment as to Causes of Action 1 (Bad Faith), 3 (Breach of Implied Covenant of Good
Faith and Fair Dealing), 4 (Unjust Enrichment), and 8 (Unfair Claims Practices)

| | | |
|---|---|---|
| 1 | **Mr. Arnett:** | So obviously it's tied -- it's value-related, so you have an inventory of what those are and then you're allowed a percentage of your contents coverage, whether it be the contents coverage on the home or the total value of your renter policy. And then we allow -- or I say -- I guess this allow certain items from being more than a certain value. So, for example, if you had a $30,000 renters' policy you couldn't schedule a $45,000 watch or something like that. You obviously have much more room on a homeowners' policy. *Id.* at 62:13-23 |

**Mr. Arnett:** "For a renter, as we discussed, you could have a renter's policy which covers, you know, contents since you're renting and you don't have dwelling coverage for up to -- if you want to go to the max, $150,000. So your total scheduled personal property cannot exceed 50 percent of that. So you would be entitled to scheduling up to 75,000 across multiple items, and not one of those items -- if it's greater than 5,000, it can't be more than 10 percent of that coverage. So it could be more than 5,000 but not more than 7,500." *Id.* at 118: 4-14

In short, had Allstate known that this was merely a renters policy, it would never have insured such expensive jewelry as it exceeds the allowable limits.

**H.   The Claim is Denied and the Policy is Voided**

The Examinations Under Oath of Dr. Mirkia and Dr. Ziaei were taken in April 2012. Allstate gathered every piece of information it could about the alleged theft and about the underlying issue of whether or not Dr. Mirkia owned the subject property and misrepresented his ownership status in said property. On July 19, 2012 Allstate sent a letter to Dr. Mirkia advising that it was denying his claim and voiding his policy based upon "your misrepresentations that you had purchased and owned the home at the time of the loss when in fact you were merely leasing a home and living in it as tenants. Had the true facts been known, Allstate would never have issued a homeowner's policy to you…" (Please see Exhibit "O", July 19, 2012 Denial Letter).

**III.**

**STANDARD FOR SUMMARY JUDGMENT**

Under federal law, a court should grant a motion for summary judgment where admissible evidence fails to demonstrate a genuine issue of material fact and the movant is entitled to judgment as a matter of law.[3] An issue is genuine "if the evidence is such that a reasonable jury could return a

---

[3] Fed. R. Civ. P. 56(c).

Motion for Partial Summary Judgment as to Causes of Action 1 (Bad Faith), 3 (Breach of Implied Covenant of Good Faith and Fair Dealing), 4 (Unjust Enrichment), and 8 (Unfair Claims Practices)

verdict for the nonmoving party,"[4] and a fact is material if it "might affect the outcome of the suit under the governing law.".[5]

If the nonmovant bears the burden of persuasion at trial, the movant simply may show that the nonmovant's evidence is insufficient to carry that burden.[6] "[T]he burden on the moving party may be discharged by showing . . . that there is an absence of evidence to support the nonmoving party's case."[7] "Since a complete failure of proof concerning an essential element,"[8] on which a party bears the burden of proof at trial establishes that the movant is "entitled to a judgment as a matter of law," the nonmovant must establish the existence of every element essential to its case.[9]

In determining whether a nonmovant has established the existence of a genuine issue of material fact requiring a jury trial, the evidence of the nonmovant must "be believed and all justifiable inferences are to be drawn in [its] favor."[10] Whether an inference is justifiable, however, depends on the evidence adduced.[11] Such evidence must be significantly probative and more than "merely colorable."[12] The nonmovant "may not rest upon mere allegation or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial."[13] An inference based upon speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment.[14] Likewise, "simply showing that there is some metaphysical doubt as to the material facts" does not establish a genuine issue for trial.[15] Lastly, the Ninth Circuit Court of Appeals has refused to

---

[4] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 257 (1986).

[5] Id. at 248.

[6] Celotex Corp. v. Catrett, 477 U.S. 317, 322-23(1986)

[7] Celotex, 477 U.S. at 325 (internal quotation marks omitted).

[8] Id. at 323-24.

[9] Id.

[10] Id. at 255.

[11] Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 595-96 (1986).

[12] United Steelworkers of Am., 865 F.2d at 1542.

[13] Liberty Lobby, 477 U.S. at 256.

[14] United Steelworkers of Am., 865 F.2d at 1542 (". . . an inference as to another material fact may be drawn in favor of the nonmoving party . . . if it is 'rational' or 'reasonable'. Of course, the inference drawn must be one permitted under the governing substantive law.") (internal citations omitted).

[15] Matsushita, 475 U.S. at 586.

McCORMICK, BARSTOW, SHEPPARD, WAYTE & CARRUTH LLP
8337 W. SUNSET RD, SUITE 350
LAS VEGAS, NV 89113

03246-01555 2795056.1          11          2:12-CV-01288-RCJ-PAL

Motion for Partial Summary Judgment as to Causes of Action 1 (Bad Faith), 3 (Breach of Implied Covenant of Good Faith and Fair Dealing), 4 (Unjust Enrichment), and 8 (Unfair Claims Practices)

1   find a "genuine issue" where the only evidence presented is "uncorroborated and self-serving"

2   testimony.[16]

3        Here, Defendants/Counterclaimants bear the burden of persuasion with regards to their claims

4   against Allstate,[17] and Allstate needs only to point out that Defendant/Counterclaimants case lacks any

5   admissible evidence demonstrating their legal claims.  Therefore, unless Defendants/Counterclaimants

6   respond by presenting "concrete evidence from which a reasonable jury could return a verdict in its

7   favor,"[18] Allstate is entitled to summary judgment.

8                                    **IV.**
                              **LAW AND ARGUMENT**
9

10       Nevada recognizes two types of allegations relating to first-party insurance bad faith, which

11  compose two of the causes of action Defendants allege against Allstate: (1) Breach of the implied

12  covenant of good faith and fair dealing (commonly known as "bad faith") and (2) violations of NRS

13  686A.310 (the Unfair Claims Practices Act).  As outlined below, bad faith cannot be found when there

14  is a "reasonable basis" for denial of coverage.  As Dr. Mirkia' misrepresentations and undisputed

15  inconsistencies gave Allstate a reasonable basis for denial of coverage, Allstate cannot be liable for

16  bad faith.  With respect to statutory violations, Defendants' counterclaim does not sufficiently plead a

17  violation of the Unfair Claims Practices Act.  More importantly, Defendants cannot point to any action

18  on the part of Allstate that would qualify as an unfair practice in settling Defendant's claim.  As

19  outlined below, Defendants counterclaims for bad faith and statutory violations of the Unfair Claims

20  Practices Act must be dismissed.

21  **A.   Allstate Cannot Be Liable For Common Law Bad Faith, as Dr. Mirkia's'
          Misrepresentations Regarding Ownership of the House Gave Allstate a Reasonable Basis
22        for Denying Coverage**

23       The Supreme Court of Nevada adopted a cause of action for an insurer's breach of the implied

24  covenant of good faith and fair dealing, more commonly known as "bad faith", in United States

---

[16] Kennedy v. Applause, Inc., 90 F.3d 1477, 1481 (9th Cir. 1996); *see generally Johnson v. Washington Metro. Transit Auth.*, 883 F.2d 125, 128 (D.C. Cir. 1989) (discussing cases in which self-serving testimony uncorroborated by other evidence did not create a genuine issue of material fact).

[17] See Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).

[18] Liberty Lobby, 477 U.S. at 256.

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
8337 W. SUNSET RD. SUITE 350
LAS VEGAS, NV 89113

03246-01555 2795056.1                    12                    2:12-CV-01288-RCJ-PAL

Motion for Partial Summary Judgment as to Causes of Action 1 (Bad Faith), 3 (Breach of Implied Covenant of Good
Faith and Fair Dealing), 4 (Unjust Enrichment), and 8 (Unfair Claims Practices)

1    Fidelity & Guar. Co. v. Peterson, 91 Nev. 617, 540 P.2d 1070 (1975). Nevada defines bad faith as (1)

2    an insurer's denial of (or refusal to pay) an insured's claim; (2) without any reasonable basis; and (3)

3    the insurer's knowledge or awareness of the lack of any reasonable basis to deny coverage, or the

4    insurer's reckless disregard as to the unreasonableness of the denial. Falline v. GNLV Corp., 107 Nev.

5    1004, 1009 (1991).[19]

6        "To establish a prima facie case of bad faith refusal to pay an insurance claim, the plaintiff

7    must establish that the insurer had **no reasonable basis** for disputing coverage, and that the insurer

8    knew or recklessly disregarded the fact that there was no reasonable basis for coverage." Falline, 107

9    Nev. at 1009. (emphasis added).[20]   Bad faith is established when the insurer acts unreasonably and

10   with knowledge that there is no reasonable basis for its conduct. Wohlers v. Bartgis, 114 Nev. 1249,

11   1258 (1999).  "Stated another way, an insurance company is not liable for bad faith if it had a

12   reasonable basis for denying a claim." American Excess Ins. Co. v. MGM Grand Hotels, 729 P.2d

13   1352, 1355 (Nev. 1986).

14        The existence of a "reasonable basis" for denying coverage as an absolute defense to a bad

15   faith action has been applied as the "reasonable dispute doctrine".  The reasonable dispute doctrine

16   provides that "the mistaken [or erroneous] withholding of policy benefits, if reasonable or if based on

17   a legitimate dispute as to the insurer's liability . . ., does not expose the insurer to bad faith liability."[21]

18   Chateau Chamberly Homeowners Assoc. v. Associated International Ins. Co., 90 Cal.App.4th 335, 108

19   Cal.Rptr.2d 776 (Cal. App. 2001) (emphasis added).  Indeed, there can be no bad faith claim when

20   there is a reasonable dispute as to the legal or factual basis for the claim of bad faith. Fraley v.

21   Allstate Ins. Co, 81 Cal. App. 4th 1282, 1291 (2000).  The question of bad faith may be decided by the

---

[19] At this point, it must be noted that the term "bad faith" is simply a manner of referring to an insurer's breach of the implied covenant of good faith and fair dealing—they are the same cause of action. However, Defendants' counterclaim improperly lists these as two separate causes of action against Allstate. Defendants' First Cause of Action is entitled "Bad Faith–Against Allstate", while its Third Cause of Action is entitled "Breach of the Implied Covenant of Good Faith and Fair Dealing– Against Allstate, Khuraibet, and Legacy". These two separately listed causes of action against Allstate are actually one cause of action, and should be dismissed as outlined herein.

[20] See also, Pioneer Chlor Alkali Co. v. National Union Fire Ins. Co., 863 F.Supp. 1237, 1247 (D. Nev. 1994); Schumacher v. State Farm Fire & Cas. Co., 467 F.Supp.2d 1090, 1095 (D. Nev. 2006); Merrick v. Paul Revere Life Ins. Co., 500 F.3d 1007, 1013 (9th Cir. Nev. 2007).

[21] While the facts show that Allstate's denial of coverage here was neither mistaken or erroneous, the pertinent element is that there is, at the very least, a legitimate dispute as to whether Allstate's coverage.

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
8337 W. SUNSET RD. SUITE 350
LAS VEGAS, NV 89113

03246-01555 2795056.1                13                2:12-CV-01288-RCJ-PAL
Motion for Partial Summary Judgment as to Causes of Action 1 (Bad Faith), 3 (Breach of Implied Covenant of Good
Faith and Fair Dealing), 4 (Unjust Enrichment), and 8 (Unfair Claims Practices)

1   court so long as there are no conflicting inferences where reasonable minds may differ.  Walbrook Ins.

2   Co. v. Liberty Mutual Ins. Co., 5. Cal. App. 4th 1445, 1454-1455 (1992).

3        While the "reasonable dispute doctrine" is a legal doctrine of California, it is simply a different

4   logical phrasing of Nevada's standard that, in order to find bad faith against an insurer, there be

5   absolutely no reasonable basis for the insurer's denial of coverage.  Thus, federal courts sitting in

6   Nevada have adopted the reasonable dispute doctrine.  "[W]here an insurer's refusal to pay insurance

7   benefits is based on a reasonable interpretation of the insurance contract, there is no basis for

8   concluding that the insurer acted in bad faith."  Hummel v. Cont'l Cas. Ins. Co., 254 F.Supp.2d 1183,

9   1191 (D. Nev. 2003) . [22]

10  **B.    NRS §687B.110 Provides Two Independent and Separate Reasonable Bases for Allstate's
         Denial Of Defendants' Claim**

11

12       As above, if an insurer has a "reasonable basis" for denying an insurance claim, or if any

13  reasonable dispute exists as to whether the insurer could deny the claim, then the insurer cannot be

14  liable for bad faith.  Here, the facts clearly demonstrate that Allstate had a reasonable basis to deny

15  coverage to Defendants for the theft property loss claim, pursuant to N.R.S. §687B.110(2) and (3),

16  based on Dr. Mirkia's misrepresentations.

17       Statements made in an application for an insurance policy are considered representations rather

18  than warranties. NRS §687B.110. The Legislature has provided specific situations in which a

19  misrepresentation bars an insured from recovery under the policy.  In particular, N.R.S. §687B.110

20  states, in pertinent part:

21           Misrepresentations, omissions, concealment of facts and incorrect
             statements shall not prevent a recovery under the policy or contract
22           unless either:

23

24       [22] See Hart v. Prudential Property and Casualty Insurance Company, 848 F.Supp. 900, 902 (D.
         Nev. 1994) (citing American Excess Insurance Co. v. MGM Grand Hotels, Inc., supra) (finding there

25  was no basis for bad faith claim against insurer when denial of benefits was based on reasonable
    interpretation of contract).  Whether the insurer had a "reasonable basis" to deny a claim may be

26  decided as a matter of law. See Pioneer Chlor Alkali Co. v. National Union Fire Ins. Co., supra, 863
    F.Supp. at 1247; Schumacher v. State Farm Fire & Cas. Co., supra, 467 F.Supp.2d at 1096.  A court

27  can conclude as a matter of law that an insurer's denial of a claim was not unreasonable, so long as
    there existed a genuine issue as to the insurer's liability. Guebara v. Allstate Ins. Co., supra, 237 F.3d

28  at 994-996.

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
6337 W. SUNSET RD. SUITE 350
LAS VEGAS, NV 89113

03246-01555 2795056.1                    14                    2:12-CV-01288-RCJ-PAL

Motion for Partial Summary Judgment as to Causes of Action 1 (Bad Faith), 3 (Breach of Implied Covenant of Good
Faith and Fair Dealing), 4 (Unjust Enrichment), and 8 (Unfair Claims Practices)

1. Fraudulent; or

2. Material either to the acceptance of the risk or to the hazard assumed by the insurer; or

3. The insurer in good faith would . . . have not issued the policy or contract . . . if the true facts had been made known to the insurer as required either by the application for the policy or contract or otherwise.

N.R.S. §687B.110(1) specifically provides that a misrepresentation that is fraudulent bars recovery under the policy—strictly for the purposes of this Motion, Allstate is not alleging that Dr. Mirkia's misrepresentations were fraudulent. However, given the other independent subsections of N.R.S. §687B.110, even a misrepresentation that is not fraudulent can bar recovery under a policy. For example, if a misrepresentation (even if it is not fraudulent or intentional) is material to the insurer's acceptance of a risk, the insured is prevented from recovering under the policy pursuant to subsection (2). Subsection (3) provides another wholly independent basis for preventing recovery under the policy where the insurer would not have issued the policy had it known the true and accurate set of facts.

The above principles were explained and applied in Randono v. Cuna Mut. Ins. Group, 106 Nev. 371 (1990). In Randono, the Court denied benefits to an insured who failed to disclose his history of hypertension in his application for life insurance. Id. at 372. Notably, in Randono there was "no claim that the inaccuracy in the application was fraudulent" and "NRS 687B.110(1) [was] therefore inapplicable." Id. Despite no evidence that the misrepresentation was fraudulent or intentional, the court held: "both NRS 687B.110(2) and NRS 687B.110(3) do apply and defeat recovery." Id. As outlined below, Defendants in the current case are barred from recovering on the policy by both subsections (2) and (3) of NRS §687B.110 as a result of Dr. Mirkia's misrepresentations and omissions.

1. **Allstate Had A Reasonable Basis on Which to Deny Coverage Pursuant to NRS 687B.110(2) Because Dr. Mirkia's Misrepresentations were Material to Allstate's Acceptance of the Risk**

NRS 687B.110(2) provides that an insurer may deny coverage benefits if the insured made a

MCCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
8337 W. SUNSET RD. SUITE 350
LAS VEGAS, NV 89113

03246-01555 2795056.1                    15                    2:12-CV-01288-RCJ-PAL
Motion for Partial Summary Judgment as to Causes of Action 1 (Bad Faith), 3 (Breach of Implied Covenant of Good Faith and Fair Dealing), 4 (Unjust Enrichment), and 8 (Unfair Claims Practices)

1    misrepresentation that is "material", either to the acceptance of the risk or to the hazard assumed by

2    the insurer.  Notably, a misrepresentation or omission need not be related to the loss itself to be

3    considered material. Randono, 106 Nev. at 376.[23]

4          In Randono, the insured failed to disclose his history of hypertension in his life insurance

5    application.  Id.  However, the insured ultimately died of stomach cancer, a disease distinctly

6    unrelated to high blood pressure. Id. at 371.  The Court nonetheless refused to allow the recovery

7    under the policy, finding that the misrepresentation and the cause of loss need not be related for the

8    misrepresentation to be deemed "material".  Id. at 375.  The Court explicitly rejected arguments by the

9    beneficiary regarding the lack of relation between the misrepresentation and the cause of loss stating

10   policy and other legal arguments could not stand "in the face of an unambiguous, controlling statute",

11   as NRS 687B.110(2) is.  As the Court noted, despite a lack of relation to the loss, "a history or

12   previous occurrence of hypertension is 'material to the acceptance of risk' in writing a life insurance

13   policy and is material 'to the hazard assumed by the insurer' in a life insurance contract." Id. at 375.

14   These are the sole inquiries in determining whether a misrepresentation was material pursuant to NRS

15   687B.110(2).

16         In the current case, it equally clear that Dr. Mirkia's misrepresentation or omission regarding

17   the fact that he owned the property, when he was in fact leasing it, is both material to Allstate's

18   acceptance of risk and to the hazard assumed by Allstate.  Indeed, Allstate's standard practices treat an

19   application for renter's insurance completely differently than applications for homeowner's insurance.

20   This is reflected in the testimony of John C. Arnett, the Allstate representative in charge of setting risk

21   management policy for Allstate.

22

23         **Question**:      Does the nature of the rental property come into factor in the
                               underwriting/risk assessment analysis at all? For instance, if you're in
24                             the process of buying or you intend to buy or you have an option to
                               buy but currently you're technically a renter, does that impact the
25

---

26   [23] See also, Martin v. United of Omaha Life Ins. Co., 91 Fed.Appx. 547, 548-49 (9th Cir. 2004) (holding that life insurer
     could rescind the life insurance policy due to the insured's failure to disclose EKG stress test even though the insured
27   ultimately died of pancreatic cancer); see also Griffin v. Old Republic Ins. Co., 133 P.3d 251, 252 (2006) (holding that
     insurers need not establish a causal connection between an aviation policy exclusion and the loss in order to avoid
28   liability).

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
8337 W. SUNSET RD. SUITE 360
LAS VEGAS, NV 89113

Motion for Partial Summary Judgment as to Causes of Action 1 (Bad Faith), 3 (Breach of Implied Covenant of Good
Faith and Fair Dealing), 4 (Unjust Enrichment), and 8 (Unfair Claims Practices)

1                 underwriting process at all?

2    **Mr. Arnett:**    The best way for me to describe is you either rent the property and you get a renters' policy, or you own the home and you get a homeowners'

3                     policy. That goes into who truly has insurable interest in the policy itself.

4

5                     . . .

6                     so for a renter . . . there is someone out there that owns that property. They have insurable interest in the dwelling itself. So we don't afford

7                     dwelling coverage to the renter. The owner of the home would buy what we call a landlord's package policy, which include -- is coverage

8                     for the dwelling. Then your renter inside the home would have their option to get renters' coverage.

9    **Question:**    For the contents?

10    **Mr. Arnett:**    Yes.

11     (Please see Exhibit "N", Deposition of John C. Arnett, 92:1-93:1.)

12        Mr. Arnett's deposition makes abundantly clear that information related to whether an

13 insurance applicant owns or rents their property is material to both the acceptance of risk and the

14 hazard assumed by Allstate. There are entirely different insurable interests at stake for a homeowner

15 rather than a renter—thus, whether an applicant owns or rents their house is, by definition, material to

16 the acceptance of risk and the hazard assumed by Allstate as required by NRS 687B.110(2).

17        Furthermore, Allstate's underwriting policies calculate the risk of coverage for renter's

18 policies on a completely different basis than that of a homeowner's policy. While this relates to

19 particularly complex aspects of underwriting and risk assessment, Mr. Arnett explained the issue in

20 layman's terms at his deposition. With a renter's policy, Allstate calculates "a value for the contents

21 only, so [Allstate] allow[s] for a certain percentage of [the value of the contents]", while with a

22 homeowner's policy, there is "the specific contents coverage, which is a percentage of your amount of

23 insurance for the overall dwelling and [Allstate] allow[s] a portion of that." See Deposition of John C.

24 Arnett, 64:16-21. Quite simply, Allstate's acceptance of risk is completely different depending on

25 whether an applicant owns or rents the property: homeowner's policy values are calculated based on

26 the value of the home, while renter's policies values are calculated based solely on the value of the

27 contents. As it was apparent to the court in Randono that the insured's previous health problems were

28 material to the acceptance of risk and the hazard assumed in the life insurance context, it is equally

MCCORMICK, BARSTOW, SHEPPARD, WAYTE & CARRUTH LLP
8337 W. SUNSET RD, SUITE 350
LAS VEGAS, NV 89113

03246-01555 2795056.1           17           2:12-CV-01288-RCJ-PAL

Motion for Partial Summary Judgment as to Causes of Action 1 (Bad Faith), 3 (Breach of Implied Covenant of Good Faith and Fair Dealing), 4 (Unjust Enrichment), and 8 (Unfair Claims Practices)

1   clear that whether an insured owns or rents their home is material in the property insurance context.

2        As outlined in detail earlier, Defendants' Application for Homeowner's Insurance, signed by

3   Dr. Mirkia on January 6, 2012, contained numerous representations that Dr. Mirkia owned the house.

4   (Please see Exhibit "H", Application for Homeowners Insurance).  The Application explicitly stated

5   that "Applicant lives in the building as: OWNER".  Id. at p. 5. The Application also indicated that

6   various discounts were being applied to the policy, including the "home buyer" discount.   It is

7   undisputed that Dr. Mirkia did not actually own the house, but rather, only leased the house at that

8   time.    Accordingly, in applying for the insurance policy with Allstate, Dr. Mirkia made a

9   misrepresentation to Allstate regarding whether he owned or rented the property.

10       Furthermore, Defendants' *own expert witness*, Gary Fye, confirmed that Dr. Mirkia had

11  misrepresented these facts, stating, "a lease purchase is not correctly identified when you say I

12  purchased a house. Technically you should say I leased a house with a purchase option. Or an option

13  to buy . . . **So that, that is either a misstatement or a misrepresentation**". (Please see Exhibit "P",

14  Deposition of Gary T. Fye, at p. 100-103. As outlined above, such a misrepresentation was without a

15  doubt material to both Allstate's acceptance of the risk and to the hazard assumed by the Allstate.

16  This provided Allstate with a clearly valid and legally justified reason to deny coverage based on NRS

17  687B.110(2).

18       However, even though Allstate had a clearly valid and legally justified reason to deny

19  coverage,  the relevant standards do not even require this.  As outlined above, Allstate cannot be found

20  liable for bad faith as long as it had some "reasonable basis" for denying coverage, or there was some

21  "reasonable dispute" as to the insurer's coverage. Dr. Mirkia's statements in his insurance application

22  fit squarely within NRS 687B.110(2)'s definition of coverage-excluding material misrepresentations.

23  This satisfies the standard by giving Allstate a "reasonable basis" for denying coverage for the loss,

24  meaning that Allstate, as a matter of law, cannot be liable for bad faith.  In sum, given that NRS

25  687B.110(2) gave Allstate a reasonable basis to deny coverage, Defendants' counterclaims for bad

26  faith against Allstate must be summarily dismissed.

27

28

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
8337 W. SUNSET RD, SUITE 350
LAS VEGAS, NV 89113

03246-01555 2795056.1                                    18                        2:12-CV-01288-RCJ-PAL

Motion for Partial Summary Judgment as to Causes of Action 1 (Bad Faith), 3 (Breach of Implied Covenant of Good
Faith and Fair Dealing), 4 (Unjust Enrichment), and 8 (Unfair Claims Practices)

2. **Allstate Had A Reasonable Basis on Which to Deny Coverage Pursuant to NRS 687B.110(3) Because Allstate In Good Faith Would Not Have Issued the Policy if Allstate Had Known the True Facts**

As outlined above, NRS 687B.110(2) and Allstate's reasonable basis for denying coverage are sufficient to dismiss the bad faith claims here. However, subsection (3) of NRS 687B.110 serves as a wholly independent basis for Allstate's denial of coverage.

NRS 687B.110(3) provides that an insurer may deny coverage benefits if the insured made a misrepresentation and the insurer "in good faith would ... have not issued the policy or contract ... if the true facts had been made known to the insurer as required either by the application for the policy or contract or otherwise."

Here, the fact that Defendants were leasing the house and did not own it, had it been known to Allstate, would have resulted in Allstate not issuing the policy. Several facts made this evident. First and foremost, it is against Allstate's policies and procedures to issue a renter's policy covering property (in this case, jewelry) in as high an amount as the one issued to Defendants.

As outlined earlier, Allstate's Risk Management Policy for Scheduled Personal Property (SPPE) & J Coverage in Nevada dictates specific limits available. Total SPPE and J Coverage cannot exceed 50% of Contents Coverage (C Coverage). Moreover, J Coverage cannot exceed 25% of Contents Coverage (C Coverage). Any single item of SPPE greater than $5,000 cannot exceed 10% of Contents Coverage (C Coverage). Any item over the per item limit must be added to SPPE. The maximum amount of coverage on a Renter's policy is $150,000 for all contents, which would accordingly limit the SPPE to $75,000 with a $15,000 per-item limit. The policy, as written, scheduled 4 items specifically, 3 of which were well in excess of the $15,000 per item limit ($29,800, $59,000, and $46,900.) Had Allstate been apprised of the true facts, that Dr. Mirkia was a renter rather than a homeowner, Allstate would never have insured such expensive jewelry.

Mr. Arnett was able to explain Allstate's limits above in the following manner at his deposition:

> **Mr. Arnett:** The best way for me to describe is you either rent the property and you get a renters' policy, or you own the home and you get a homeowners' policy." *See* Deposition of John C. Arnett, 92:10-12.

Motion for Partial Summary Judgment as to Causes of Action 1 (Bad Faith), 3 (Breach of Implied Covenant of Good Faith and Fair Dealing), 4 (Unjust Enrichment), and 8 (Unfair Claims Practices)

1

2

3

4

5

6

7

8

9

10

**Mr. Arnett**:   So obviously it's tied -- it's value-related, so you have an inventory of what those are and then you're allowed a percentage of your contents coverage, whether it be the contents coverage on the home or the total value of your renter policy. And then we allow . . . certain items from being more than a certain value. So, for example, if you had a $30,000 renters' policy you couldn't schedule a $45,000 watch or something like that. You obviously have much more room on a homeowners' policy. *Id.* at 62:13-23

**Mr. Arnett**:   "For a renter, as we discussed, you could have a renter's policy which covers, you know, contents since you're renting and you don't have dwelling coverage for up to -- if you want to go to the max, $150,000. So your total scheduled personal property cannot exceed 50 percent of that. So you would be entitled to scheduling up to 75,000 across multiple items, and not one of those items -- if it's greater than 5,000, it can't be more than 10 percent of that coverage. So it could be more than 5,000 but not more than 7,500." *Id.* at 118: 4-14

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Quite simply, Allstate would never have issued an insurance policy to Defendants that included coverage of individual items of jewelry worth $29,800, $59,000, and $46,900, respectively, if Dr. Mirkia had been truthful in his application by stating he did not own the house. Allstate does not issue renter's policies covering jewelry in these high-value amounts—Allstate's coverage schedules and the deposition testimony of Mr. Arnett, Allstate's underwriting representative, make this absolutely clear.

Accordingly, NRS 687B.110(3) clearly shows that Allstate properly denied coverage because of Dr. Mirkia's misrepresentations because Allstate "in good faith would … have not issued the policy or contract … if the true facts had been made known to the insurer as required either by the application for the policy or contract … or otherwise." Again, though this gave Allstate a clearly valid and legally justified reason to deny coverage, the relevant standard is simply that Allstate had some "reasonable basis" for denying coverage. Dr. Mirkia's statements in his insurance application fit squarely within NRS 687B.110(3)'s definition of coverage-excluding misrepresentations, given that Allstate would not have issued the policy had it known the true facts. This satisfies the standard by giving Allstate a "reasonable basis" for denying coverage for the loss, meaning that Allstate, as a matter of law, cannot be liable for bad faith. In sum, NRS 687B.110(3) gave Allstate a reasonable basis to deny coverage, wholly separate and independent from NRS 687B.110(2) outlined earlier. Accordingly, this serves as a wholly separate and independent basis on which Defendants'

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
5337 W. SUNSET RD, SUITE 350
LAS VEGAS, NV 89113

03246-01555 2795056.1

20

2:12-CV-01288-RCJ-PAL

Motion for Partial Summary Judgment as to Causes of Action 1 (Bad Faith), 3 (Breach of Implied Covenant of Good Faith and Fair Dealing), 4 (Unjust Enrichment), and 8 (Unfair Claims Practices)

1  counterclaims for bad faith against ALLSTATE must be summarily dismissed.

2  **C.  Allstate Has Not Engaged in Any Practices Which Violate Nevada Revised Statute**
3  **Section 686A.310, Nor Have Defendants Properly Plead Any Such Violations**

4  N.R.S. 686A.310, also known as the Unfair Claims Practices Act, provides for an insurer's

5  liability insurer for damages caused by unfair practices in settling claims.  Unlike the bad faith cause

6  of action outlined above, this statute is designed to "directly address the manner in which an insurer

7  processes a claim."  Schumacher v. State Farm First & Casualty Co., 467 F.Supp.2d 1090, 1095

8  (2006).  To this end, the statute contains a list of acts which insurers must comply with.  For example,

9  the Act requires that insurers "acknowledge and act reasonably promptly" in response to claims, and

10  affirm or deny coverage of claims "within a reasonable time."  N.R.S. 686A.310.

11  **1.  Defendants' Counterclaims for Violations of Nevada's Unfair Claims Practices**
    **Act Must Be Dismissed, As No Facts Have Been Pled Establishing Such a**
12  **Violation**

13  In Henderson v. Property Ins. Cas. Co. of Hartford, 2012 U.S.Dist. LEXIS 83759 (D. Nev.

14  2012), the Court dismissed the insured's Complaint where she asserted a cause of action for breach of

15  the Nevada Unfair Claims Practices Act, but did not specify in detail what wrongful conduct the

16  insurer had purportedly perpetrated.  The Court held that an insured must specify the purportedly

17  wrongful conduct in order to withstand scrutiny, as well as specifying which provision(s) of the statute

18  the insurer has allegedly violated.  Id. at 6-7.  The insured cannot simply throw out blanket allegations

19  of a violation of the foregoing statute, and must instead what specific provisions have been violated

20  and how they have been violated by the insurer.  See Winkler v. Hartford Financial Services Group

21  Inc., 2011 WL 1705559 (D.C. Nev. 2011) (dismissing claim where plaintiffs "do not allege any facts

22  supporting a claim under Nevada's Unfair Claims Practices Act and do not even specify which portion

23  of the act they allege Defendant violated.").

24  With this pleading standard in mind, Allstate now turns to Defendants' Eighth Cause of Action

25  for violation of the Unfair Claims Practice Act, which is completely devoid of any detail regarding

26  what actions, if any, by Allstate violate the Act. (Please see Defendants' Amended Counterclaim And

27  Third Party Complaint, Document #44, ¶ 135-141).  Indeed, the relevant parts of Defendants'

28  Counterclaim, where *some* detail regarding the actual alleged acts should have been included per the

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
8337 W. SUNSET RD. SUITE 350
LAS VEGAS, NV 89113

03246-01555 2795056.1                    21                    2:12-CV-01288-RCJ-PAL

Motion for Partial Summary Judgment as to Causes of Action 1 (Bad Faith), 3 (Breach of Implied Covenant of Good
Faith and Fair Dealing), 4 (Unjust Enrichment), and 8 (Unfair Claims Practices)

required pleading standards, read as a verbatim restatement of the statute itself with no application to facts:

      138.    Allstate has continued to resist a prompt, fair, and equitable settlement of the counterclaimants' claims in which liability of the insurer should be reasonably clear.

      139.    Allstate also failed to affirm or deny coverage of the counterclaimants' claims within a reasonable time after proof of loss requirements were completed and submitted by the counterclaimants.

      140.    Allstate failed to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under its insurance policies.

      141.    Allstate failed to promptly provide to the counterclaimaints a reasonable explanation of the basis in the insurance policy, with respect to the facts of the insured's claim and the applicable law, for the denial of the claim. Instead, Allstate chose to engage in a lengthy and meretricious process of investigating the counterclaimants' loss and interviewing them for hours after Allstate knew, or reasonably should have known, that it would deny the claim based on its specious allegation of misrepresentation regarding the status of the insured's home ownership.

(Please see Defendants' Amended Counterclaim And Third Party Complaint, Document #44).

Quite simply, Defendants have not alleged *any* facts which support a claim under Nevada's Unfair Claims Practices Act. As the time to amend these claims has passed, Defendants' counterclaims based on the Unfair Claims Practices Act must be dismissed.

    **2.**    **Defendants' Counterclaims for Violations of Nevada's Unfair Claims Practices Act Must Be Dismissed, As Defendants Cannot Prove the Act Has Been Violated**

In addition to the above pleadings deficiencies, Defendants cannot substantively establish any violations of the Nevada's Unfair Claims Practices Act. Even assuming the above violations of the Act may proceed, each claim fails. For purposes of analysis, Allstate will identify which subsection of the Act that Defendants appear to be referring to in their Counterclaim, and analyze each in turn.

    **a.**    **Defendants Cannot Establish that Allstate Violated N.R.S. 686A.310(e)**

Paragraph 138 of Defendants' Counterclaim claims that "Allstate has continued to resist a prompt, fair, and equitable settlement of the counterclaimants' claims in which liability of the insurer should be reasonably clear". This allegation corresponds to N.R.S. 686A.310(e), which requires insurers to "effectuate prompt, fair and equitable settlements of claims in which liability of the insurer

MCCORMICK, BARSTOW, SHEPPARD, WAYTE & CARRUTH LLP
8337 W. SUNSET RD. SUITE 350
LAS VEGAS, NV 89113

03246-01555 2795056.1    22    2:12-CV-01288-RCJ-PAL

Motion for Partial Summary Judgment as to Causes of Action 1 (Bad Faith), 3 (Breach of Implied Covenant of Good Faith and Fair Dealing), 4 (Unjust Enrichment), and 8 (Unfair Claims Practices)

1    has become reasonably clear." Though Defendants' Counterclaim provides no further facts on this

2    point, it is clear based merely on the facts outlined earlier in this Motion that Defendant cannot, as a

3    matter of law, prove a violation of N.R.S. 686A.310(e). Indeed, for Defendants to even made a prima

4    facie claim on this subsection, they would have to identify an exact point where Allstate's liability was

5    "reasonably clear". However, there is not one single point at which liability was reasonably clear.

6         As outlined above, the circumstances of Defendants' claim were extremely suspicious from the

7    moment Allstate received it. Again, the alleged loss occurred just 23 days after the last piece of

8    expensive jewelry was scheduled, just 5 days after Allstate notified Dr. Mirkia it cancelled his policy,

9    and on the same day on which the alleged thief called the police indicating she was being held against

10   her will by Dr. Mirkia and asked the police to search her bags. Allstate's expert Paul Burkett

11   explained in detail in his July 11, 2013 Report that SIU became involved in this claim because it was a

12   (1) mysterious loss just after coverage limits were increased, (2) the loss occurred within 90 days of

13   the policy inception, and (3) the loss was reported more than ten (10) days after the theft. (Please see

14   Exhibit "M", Expert Report of Paul Burkett, Page 14 of 18). Indeed, Dr. Mirkia's *own expert* Elliott

15   S. Flood agreed that this is exactly the type of case in which SIU involvement would be anticipated

16   because of the multiple red flags.[24] Despite the highly suspicious nature and timing of the alleged

17   theft, Allstate opened up a claim when it was notified of the alleged theft by Dr. Mirkia on March 1,

18   2012.

19        In the course of its diligent investigation, Allstate discovered that Dr. Mirkia had

20   misrepresented the fact that he owned the house. This has been covered exhaustively above, but it

21   will suffice to say that Allstate's strong bases for denial of Defendants' claims based on

22   misrepresentations preclude any argument that Allstate's liability ever became "reasonably clear", as

23   would be required to allege a violation of N.R.S. 686A.310(e). Defendants can point to no facts that

24   support the claim that Allstate failed to effectuate a prompt, fair and equitable settlements of claims in

25   which liability of the insurer has become reasonably clear. Accordingly, Defendants' Counterclaim

26   against Allstate based on N.R.S. 686A.310(e) must be dismissed.

27   _____

28   [24] As outlined earlier, Elliot Flood's deposition was just completed and will be supplemented to this Court once the
transcript is made available.

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
8337 W. SUNSET RD. SUITE 350
LAS VEGAS, NV 88113

03246-01555 2795056.1                    23                    2:12-CV-01288-RCJ-PAL
Motion for Partial Summary Judgment as to Causes of Action 1 (Bad Faith), 3 (Breach of Implied Covenant of Good
Faith and Fair Dealing), 4 (Unjust Enrichment), and 8 (Unfair Claims Practices)

b.   **Defendants Cannot Establish that Allstate Violated N.R.S. 686A.310(d)**

Paragraph 139 of Defendants' Counterclaim claims that Allstate "failed to affirm or deny coverage . . . within a reasonable time after proof of loss requirements were completed and submitted". This allegation corresponds to N.R.S. 686A.310(d), which requires insurers to "affirm or deny coverage of claims within a reasonable time after proof of loss requirements have been completed and submitted by the insured." Though Defendants' Counterclaim provides no further facts on this point, the timeline of Allstate's handling of the claim makes clear that Defendants cannot, as a matter of law, prove a violation of N.R.S. 686A.310(d).

As outlined earlier, the alleged theft occurred on or about January 30, 2012—however, the claim was not reported to Allstate until March 1, 2012, at which point Allstate opened up a claim and *immediately* began investigating the claim.   Throughout March and April Allstate gathered every piece of information it could about the alleged loss and the ownership issue as spelled out in the fact section above.   Receipts, appraisals, police reports, recorded statements, discussions with police, investigation into the alleged thief, investigation into the alleged thief's agency, and leasing documentation were all obtained shortly after the claim was opened up.   This was an exhaustive investigation, involving coordination of investigators, claims handlers, underwriters, internal and external counsel, police officers, third-party agencies, and other representatives.   Throughout the process, standard update letters were sent to Defendants advising that the investigation was on-going. There is not a single specific allegation of delay made by Defendants in either their pleadings or in any evidence produced in this matter.

The lack of any basis for a violation of N.R.S. 686A.310(d) is reflected in the expert report of Paul Burkett, who outlined in detail the timeline of ALLSTATE's handling of the claim here.   (See Exhibit "M", Expert Report of Paul Burkett, p. 12-16).   Indeed, Mr. Burkett, after reviewing the facts, concluded that there was "no delay in conducting the investigation since numerous elements needed to be gathered and reviewed." (Id. at p. 14).   Put simply, Defendants cannot point to any facts to support a claim that Allstate failed to affirm or deny coverage within a reasonable time, as would be required to allege a violation of N.R.S. 686A.310(d).   Accordingly, Defendants' Counterclaim against ALLSTATE based on N.R.S. 686A.310(d) must be dismissed.

McCORMICK, BARSTOW, SHEPPARD, WAYTE & CARRUTH LLP
8337 W. SUNSET RD. SUITE 350
LAS VEGAS, NV 89113

03246-01555 2795056.1                                        24                                        2:12-CV-01288-RCJ-PAL
Motion for Partial Summary Judgment as to Causes of Action 1 (Bad Faith), 3 (Breach of Implied Covenant of Good Faith and Fair Dealing), 4 (Unjust Enrichment), and 8 (Unfair Claims Practices)

c.    **Defendants Cannot Establish that Allstate Violated N.R.S. 686A.310(c)**

Paragraph 140 of Defendants' Counterclaim claims that Allstate "failed to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under its insurance policies". This allegation corresponds to N.R.S. 686A.310(c), which requires insurers to "adopt and implement reasonable standards for the prompt investigation and processing of claims arising under insurance policies". Though Defendants' Counterclaim provides no further facts on this point, the relevant expert reports make clear that Defendants cannot, as a matter of law, prove a violation of N.R.S. 686A.310(c).

Mr. Burkett's expert report affirms that the "Allstate claims reporting system documents and sets excellent follow ups to allow for the prompt investigation of the insured (Mirkia) claim as required under the statute". (See Exhibit "M", Expert Report of Paul Burkett, p. 13). While Defendants' expert Fye claims that Allstate violated N.R.S. 686A.310(c), Fye's report contains no support for this conclusion, and no analysis of the actual claims practices and procedures used here.

Mr. Burkett's rebuttal report reflects that the claims logs listing all of the Allstate adjuster activities were "very detailed as to time, date, activity, contact, ongoing investigation, and follow ups to satisfy requirements under NRS 686A.310." (See Exhibit "Q", Rebuttal Report of Paul Burkett, at p. 9). Those logs demonstrated that Allstate adjusters followed industry custom and practice by : "(1) conducting coverage verification and coverage analysis; (2) conducting on-site inspection of the loss; (3) conducting interviews with and gathering statements from the defendants; (4) properly identifying the defendant's property; (5) requesting and receiving copies of all official reports from the police and the property tax rolls; (6) requesting and receiving copies of the lease; (7) requesting and receiving copies of any additional records from the defendants; and (8) requesting and receiving copies of actual purchase receipts for the stolen jewelry items to establish a value for replacement. Lastly, a proper review and determination of the defendant's insurable interest was also processed by the adjuster as per procedure." (Id. at p. 10-11). In addition to those procedures, Allstate adhered to follow-up procedures concerning its investigation, as confirmed by Mr. Warner, where Mr. Warner reviewed the file and sent status letters every 20-30 days. (Id. at p. 11).

Put simply, Defendants' claim that Allstate did not adopt and implement reasonable standards

MCCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
8337 W. SUNSET RD, SUITE 350
LAS VEGAS, NV 89113

03246-01555 2795056.1                          25                    2:12-CV-01288-RCJ-PAL

Motion for Partial Summary Judgment as to Causes of Action 1 (Bad Faith), 3 (Breach of Implied Covenant of Good Faith and Fair Dealing), 4 (Unjust Enrichment), and 8 (Unfair Claims Practices)

1   for the prompt investigation and processing of claims is not grounded in any fact.  Defendants have

2   not, and cannot, point to any specific facts to support a claim that Allstate violated   N.R.S.

3   686A.310(c).    Accordingly, Defendants' Counterclaim against ALLSTATE based on N.R.S.

4   686A.310(c) must be dismissed.

5         **d.**   **Defendants Cannot Establish that Allstate Violated N.R.S. 686A.310(n)**

6         Finally, Paragraph 141 of Defendants' Counterclaim claims that Allstate "failed to promptly

7   provide to the counterclaimaints a reasonable explanation of the basis in the insurance policy".  This

8   allegation corresponds to N.R.S. 686A.310(n), which requires insurers to "provide promptly to an

9   insured a reasonable explanation of the basis in the insurance policy, with respect to the facts of the

10  insured's claim and the applicable law, for the denial of the claim or for an offer to settle or

11  compromise the claim."   Defendants cannot, as a matter of law, prove a violation of N.R.S.

12  686A.310(n).

13        Allstate incorporates by reference herein the discussion above of the reasonable time period

14  within which it returned a coverage decision, in conformance with N.R.S. 686A.310(d).  To reiterate,

15  there is absolutely no indication here that Allstate did not "promptly" issue a coverage decision here.

16  N.R.S. 686A.310(n) additionally requires that "a reasonable explanation of the basis in the insurance

17  policy, with respect to the facts of the insured's claim and the applicable law" be provided to the

18  insured.   However, this requirement was clearly complied with.   In Allstate's denial letter to

19  Defendants on July 19, 2012, the purpose for the denial was clearly outlined—Allstate informed Dr.

20  Mirkia that it was denying his claim and voiding his policy based upon "your misrepresentations that

21  you had purchased and owned the home at the time of the loss when in fact you were merely leasing a

22  home and living in it as tenants.  Had the true facts been known, Allstate would never have issued a

23  homeowner's policy to you…" (Please see Exhibit "O", July 19, 2012 Denial Letter). This letter also

24  contains a detailed outline of the applicable law.  Id.  Quite simply, the issuance of a denial letter,

25  detailing a valid reason for the denial with an outline of the applicable law, issued within a timely

26  manner after receipt of the claim, precludes any claim that Allstate violated N.R.S. 686A.310(n).

27  Defendants have not, and cannot, point to any facts supporting the claim that this promptly-delivered

28  explanation was unreasonable.  Accordingly, Defendants' Counterclaim against Allstate based on

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
8337 W. SUNSET RD, SUITE 350
LAS VEGAS, NV 89113

03246-01555 2795056.1                    26                    2:12-CV-01288-RCJ-PAL

Motion for Partial Summary Judgment as to Causes of Action 1 (Bad Faith), 3 (Breach of Implied Covenant of Good
Faith and Fair Dealing), 4 (Unjust Enrichment), and 8 (Unfair Claims Practices)

1    N.R.S. 686A.310(n) must be dismissed.

2            e.    **Conclusion as to Defendants Claims that Allstate Violated the Unfair**
                   **Claims Practices Act**
3

4            Defendants' counterclaim contains no further allegations which correspond to any specific

5    subsection of NRS 686A.310.  No facts exist which support Defendants' counterclaim that Allstate

6    violated any of the above-outlined subsections, or any other subsection, of NRS 686A.310.  This leads

7    to only one conclusion, reflected in the report of Mr. Burkett, who stated "with a reasonable degree of

8    professional certainty that the Allstate claims representative did not breach their duties as outlined in

9    the Nevada statute (NRS 686A.310) concerning the insured's claim."  (See Exhibit "Q", Rebuttal

10   Report of Paul Burkett, at p. 16).

11           In sum, Defendants have not properly pled any violation of Nevada's Unfair Claims Practices

12   Act. Furthermore, Defendants point to absolutely no facts to support such claims, and an examination

13   of the evidence clearly shows, as a matter of law, that Allstate took no action which violated Nevada's

14   Unfair Claims Practices Act.  Accordingly, Defendants' counterclaims based on Nevada's Unfair

15   Claims Practices Act must be summarily dismissed.

16   **D.    There is No Viable Claim For Unjust Enrichment**

17           "Unjust enrichment is the unjust retention of money or property of another against the

18   fundamental principles of justice or equity and good conscience." Asphalt Products Corp. v. All Star

19   Ready Mix, Inc. (1995) 111 Nev. 799, 802.  A necessary element for this requires that a party unjustly

20   retains money.  Id.  Allstate did not unjustly retain any money in this matter.  Allstate did not receive

21   any premiums from Dr. Mirkia for this policy which is unjustly retained.  There simply is not unjust

22   enrichment to be returned to Dr. Mirkia.  There has been zero evidence produced by Defendants in

23   discovery that Allstate was unjustly enriched in any way.  Allstate did not receive any premiums on

24   this policy which it then kept after voiding the policy based on Dr. Mirkia's repeated

25   misrepresentations.  As such, this claim must necessarily be dismissed.

26

27

28

McCormick, Barstow,
Sheppard, Wayte &
Carruth LLP
6337 W. Sunset Rd, Suite 350
Las Vegas, NV 89113

03246-01555 2795056.1                                    27                    2:12-CV-01288-RCJ-PAL
Motion for Partial Summary Judgment as to Causes of Action 1 (Bad Faith), 3 (Breach of Implied Covenant of Good
Faith and Fair Dealing), 4 (Unjust Enrichment), and 8 (Unfair Claims Practices)

# V.

## CONCLUSION

In short, Dr. Mirkia made clear, unequivocal, and repeated misrepresentations regarding his ownership status in the property. He misrepresented his ownership status to Walid Khuraibet and subsequently told multiple versions at multiple times which have been disproven by independent third-parties. It is assumed that Dr. Mirkia will testify that he did not make such misrepresentations and it is agreed that this would be an issue for the jury to decide. However, there can be no debate that there is a genuine dispute as to whether or not he misrepresented that he owned the property; and the entire crux of this Motion is that the existence of this genuine dispute gives rise to a reasonable basis to deny the claim.

Dr. Mirkia misrepresented his ownership status on the Application for Insurance, which he himself signed. Dr. Mirkia misrepresented his ownership status to an independent third-party inspector who came to appraise the property. Dr. Mirkia misrepresented his ownership status to an entirely different company, Chubb, when seeking insurance from them. All of these misrepresentations are plainly established by the Exhibits attached in support of this Motion.

As the above facts demonstrate, both the timing of the alleged theft (weeks after the jewelry was scheduled and days after the policy was cancelled) and the nature of the alleged theft (even the detective doesn't think it was stolen) generate multiple red flags. The highly suspicious timing and nature of the theft caused Allstate SIU to become involved and to investigate the ownership status of this property. The investigation was prompt, fair, diligent, and reasonable. Once Allstate was able to confirm that Dr. Mirkia plainly did not own the property and plainly misrepresented that he did, Allstate denied the claim. Allstate's position and policy has always been unequivocally clear: had it known that Dr. Mirkia did not own the home it would never have written this policy.

Denying a claim based upon a material misrepresentation such as this is a clear example of the type of genuine dispute that cannot be bad faith as a matter of law. Similarly, there have been no violations of the Unfair Claims Practices Act as a matter of law. Lastly, Allstate has not been in any way unjustly enriched by Dr. Mirkia with regards to this policy procured via his misrepresentations.

As such, Allstate requests summary judgment as to Causes of Action numbered One (Bad

McCORMICK, BARSTOW, SHEPPARD, WAYTE & CARRUTH LLP
8337 W. SUNSET RD, SUITE 350
LAS VEGAS, NV 89113

03246-01555 2795056.1                28                2:12-CV-01288-RCJ-PAL

Motion for Partial Summary Judgment as to Causes of Action 1 (Bad Faith), 3 (Breach of Implied Covenant of Good Faith and Fair Dealing), 4 (Unjust Enrichment), and 8 (Unfair Claims Practices)

1   Faith), Three (Breach of Implied Covenant of Good Faith and Fair Dealing), Four (Unjust

2   Enrichment), and Eight (Unfair Claims Practices).

3       DATED this 24 day of January, 2014

4                   McCORMICK, BARSTOW, SHEPPARD,

5                   WAYTE & CARRUTH LLP

6

7               By       //s// Philip A. John

8                   Gordon M. Park
                Nevada Bar No. 7124

9                   Philip A. John
                Nevada Bar No. 10627

10                  8337 West Sunset Road, Suite 350
                Las Vegas, Nevada 89113

11                  Tel. (702) 949-1100

12                  Attorneys for Plaintiff/Counterdefendant Allstate

13                  Property and Casualty Insurance Company, Third-
                Party Defendants, Walid Khuraibet and Legacy

14                  Agency, LLC, a Nevada corporation

15

16

17

18

19

20

21

22

23

24

25

26

27

28

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
8337 W. SUNSET RD, SUITE 350
LAS VEGAS, NV 89113

03246-01555 2795056.1            29            2:12-CV-01288-RCJ-PAL

Motion for Partial Summary Judgment as to Causes of Action 1 (Bad Faith), 3 (Breach of Implied Covenant of Good
Faith and Fair Dealing), 4 (Unjust Enrichment), and 8 (Unfair Claims Practices)

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this _24_ day of January, 2014, a true and correct copy of **MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO CAUSES OF ACTION 1 (BAD FAITH), 3 (BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING), 4 (UNJUST ENRICHMENT), AND 8 (UNFAIR CLAIMS PRACTICES)** was served via the United States District Court CM/ECF system on all parties or persons requiring notice.

By _____

Kristin Thomas, an Employee of
MCCORMICK,   BARSTOW,   SHEPPARD,
WAYTE & CARRUTH LLP

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
8337 W. SUNSET RD, SUITE 350
LAS VEGAS, NV 89113

03246-01555 2795056.1

30

2:12-CV-01288-RCJ-PAL

Motion for Partial Summary Judgment as to Causes of Action 1 (Bad Faith), 3 (Breach of Implied Covenant of Good Faith and Fair Dealing), 4 (Unjust Enrichment), and 8 (Unfair Claims Practices)